(October 18, 1892.)

## SHEPHERD v. GRIMMETT.

[31 Pac. 793.]

TEST OATH LAW CONSTITUTIONAL.—The elector's oath enacted at the first session of the legislature of the state of Idaho and approved February 25, 1891, held not to be an *ex post facto* law, not in the nature of a bill of attainer, and to be clearly within the constitutional power of the legislature.

(Syllabus by the court.)

APPLICATION by Joseph R. Shepherd for a writ of mandate to compel Hyrum Grimmett, registrar of voters, to register plaintiff as a voter. Application denied.

Arthur Brown, Alfred Budge, John A. Bagley and C. W. Bennett, for Petitioner.

The electors' oath bill partakes of the nature of "a bill of pains and penalties," which is included in the prohibition of the constitution of the United States that "no bill of attainder shall be passed," and that "no state shall pass any bill of attainder." (Cooley's Constitutional Limitations, 261; Story on the Constitution, 1338; Bouvier's Law Dictionary, 247; *Fletcher v. Peck,* 6 Cranch, 87; *Ex parte Garland,* 4 Wall. 333-388.) It is a legislative conviction for a supposed crime, which is void. (*Fletcher v. Peck,* 9 Cranch, 87; *Cummings v. Missouri,* 4 Wall. 277; *Ex parte Garland,* 4 Wall. 333; *Drehman v. Stifle,* 8 Wall. 595.) Any law that makes an act done before the passage of the law, and which was innocent when done, criminal, and punishes such act, is *ex post facto,* and void. (*Calder v. Bull,* 3 Dall. 386; *Kring v. State of Missouri,* 107 U. S. 221, 2 Sup. Ct. Rep. 443; *Ex parte Bethurum,* 66 Mo. 295; Smith's Constitutional and Statutory Construction, sec. 367.)

Per CURIAM.—This is an application by the plaintiff for a writ of mandate, to the defendant, as registrar of Paris precinct in Bear Lake county, Idaho, commanding him to register the plaintiff as an elector of said precinct, which defendant had refused to do for the reason that plaintiff refused to take the oath required by the statutes of Idaho as a condition precedent to registration. There was no appearance on the part of defendant. It is claimed by the plaintiff that the statute enacted by the first legislature of the state of Idaho, and generally known as the "Test Oath Law," is unconstitutional and void, upon the following grounds: 1. That it is in contravention of section 9, article 1 of the federal constitution, in that it is *ex post facto* in its character; 2. That it annuls the provisions of section 3, article 6 of the constitution of the state of Idaho; 3. That it is in the nature of a bill of attainder. Among the most embarrassing problems presented to the framers of the state constitution of Idaho was the regulation of the right of

suffrage. Almost since the organization of the territory there had existed within its borders an organization which persisted in practices and teachings which were in open defiance of both local and federal laws which they considered at all impinged upon what they termsd their "religious liberties." These practices made them not only a disturbing element in the commonwealth, but a constant menace to free American institutions and government. The necessity for some action putting a period to the advancement of the pernicious doctrines of polygamy and bigamy found recognition in the enactment by the legislature of the territory of section 501 of the Revised Statutes, known as the "Test Oath Act," and which prescribed an oath to be taken by all persons as a condition precedent to the exercise of the elective franchise. This act, by its provisions, excluded from the elective franchise in the territory of Idaho all members of the said organization. Some of the members of that organization at once set about divining schemes by which the law might be evaded or set at naught. In October, 1888, just prior to the biennial election of that year, a large number of the members of that organization in Idaho, presumably acting under the direction of indiscreet leaders, made a pretended withdrawal from the organization, and thereafter registered as voters, taking the required oath. Several parties were indicted in the district court of the third district of the territory, and, a test case having been made, the question of the validity of the statute known as the "Test Oath Law," was passed upon by the supreme court of the United States in the case of *Davis v. Beason,* 133 U. S. 333, 10 Sup. Ct. Rep. 299, and the validity of the statute affirmed by that tribunal. The substance of the "test oath" statute enacted by the territorial legislature was embodied in section 3, article 6 of the constitution of the state of Idaho, which is as follows, viz. :

"Sec. 3. No person is permitted to vote, serve as a juror, or hold any civil office, who is under guardianship, idiotic, or insane, or who has at any place been convicted of treason, felony, embezzlement of public funds, bartering or selling or offering to barter or sell his vote, or purchasing or offering to purchase the vote of another, or other infamous crime, and who has not

been restored to the right of citizenship, or who at the time of such election is confined in prison on conviction of a criminal offense, or who is a bigamist or polygamist, or is living in what is known as patriarchal, plural or celestial marriage, or in violation of any law of this state or of the United States forbidding any such crime, or who in any manner teaches, advises, counsels, aids or encourages any person to enter into bigamy, polygamy, or such patriarchal, plural or celestial marriage, or to live in violation of any law, or to commit any such crime, or who is a member of, or contributes to the support, aid or encouragement of, any order, organization, association, corporation or society which teaches, advises, counsels, encourages or aids any person to enter into bigamy, polygamy or such patriarchal or plural marriage, or which teaches or advises that the laws of this state prescribing rules of civil conduct are not the supreme law of the state; nor shall Chinese nor persons of Mongolian descent not born in the United States, nor Indians, not taxed, who have not severed their tribal relations, and adopted the habits of civilization, either vote, serve as jurors, or hold any civil office."

The constitutional convention, careful not to restrict the power of the legislature in this respect, and to sufficiently provide for any contingency that might thereafter arise, enacted section 4 of article 6, which is as follows: "Sec. 4. The legislature may prescribe qualifications, limitations, and conditions for the right of suffrage additional to those prescribed in this article, but shall never annul any of the provisions in this article contained." The first legislature that convened under the state organization, in an act entitled "Elections and Electors," provided, among other things, that the registrar must, before he registers any applicant, require him to take and subscribe the oath to be known as the "Elector's Oath," which is as follows:

"Elector's Oath: I do swear, or affirm, that I am a male citizen of the United States, of the age of twenty-one years (or will be) the day of ———, A. D. 18— (naming date of next succeeding election) ; that I have (or will have) actually resided in this state for six months, and in the county for thirty days

next preceding the next ensuing election. (In case of any election requiring a different time of residence, so make it.) That I have never been convicted of treason, felony, embezzlement of public funds, bartering or selling or offering to barter or sell my vote, or purchasing or offering to purchase the vote of another, or other infamous crime, without thereafter being restored to the right of citizenship. That since the first day of January, 1888, and since I have been eighteen years of age, I have not been a bigamist or polygamist, or have lived in what is known as patriarchal, plural, or celestial marriage, or in violation of any law of this state or of the United States forbidding any such crime; and I have not during said time taught, advised, counseled, aided or encouraged any person to enter into bigamy, polygamy or such patriarchal, plural or celestial marriage, or to live in violation of any such law, or to commit any such crime; nor have I been a member of, or contributed to the support, aid or encouragement of, any order, organization, association, corporation or society which, through its recognized teachers, printed or published creed, or other doctrinal works, or in any other manner, teaches or has taught, advises or has advised, counsels, encourages, or aids, or has counseled, encouraged or aided, any person to enter into bigamy, polygamy or such patriarchal or plural marriage or which teaches or has taught, advises or has advised, that the laws of this state or of the territory of Idaho, or of the United States applicable to said territory, prescribing rules of civil conduct, are not the supreme law. That I will not commit any act in violation of the provisions in this oath contained. That I am not now registered or entitled to vote at any other place in this state. That I do regard the constitution of the United States, and the laws thereof, and the constitution of this state, and the laws thereof, as interpreted by the courts, as the supreme law of the land, the teachings of any order, organization, or association to the contrary notwithstanding. (When made before a judge of election, add: 'And I have not previously voted at this election.') So help me God."

It is the validity of this provision of the statute which is attacked in this proceeding.

With the policy of either the constitutional provision or the statute the court has nothing to do. If circumstances have arisen since the enactment of the statute which would seem to make its abrogation desirable, it is to another department of the government such an appeal must be made. It is the province of the court only to decide upon the validity of the law. "In the case of *Burch v. Van Horn,* 3 Cong. Elect. Cas. 205, in a report which was adopted unanimously, it was held that the right of a state by a new constitution to require all persons to take an oath that they have not done certain acts, and that they have been loyal to the United States, as a prerequisite to registration and to the right to vote, was absolute, and was not forbidden by the principle of the decision in the case of *Cummings v. State,* 4 Wall. 277." This is all that the act under consideration does. It is true it makes additional qualifications necessary, but that is directly authorized by section 4, article 6 of the constitution.

The suggestion of counsel that the law of the first session of the state legislature annuls section 3 of article 6 of the constitution of Idaho, in view of the direct provisions of section 4 of that article, is, in our view, too attenuated to demand the serious consideration of the court. "A state may prescribe a test oath for all electors without violating the constitution of the United States, but if the legislature of a state be not empowered by the state constitution to prescribe the qualifications of voters, it cannot prescribe a test oath which shall add any substantive qualification to those prescribed in the constitution, and yet may prescribe a test oath which, without adding to or changing the qualifications prescribed in the constitution, shall be effectual to disclose the presence or absence of such qualifications. *If, however, the legislature be invested by the constitution with power to prescribe the qualifications of voters, it may prescribe a substantive qualification in the form of a test oath."* (The italics are ours.) (Paine on Elections, p. 69, and authorities there cited.) "When the constitution of a state has prescribed qualifications for voters, and defined the qualifications to an officer, it is not competent for the legislature to add to, or

to in any way alter, such prescribed and defined qualification, unless the power to do so is expressly or by necessary implication conferred upon it by the constitution itself." (*Thomas v. Owens,* 4 Md. 189; McCrary on Elections, 2d ed., secs. 72-252; *United States v. Slater,* 4 Woods, 356, 6 Fed. 824; *Rison v. Farr,* 24 Ark. 161, 87 Am. Dec. 52, and note; note to *Blair v. Ridgely,* 41 Mo. 63, 97 Am. Dec. 264, and cases there cited.)

It was strenuously claimed by counsel for the petitioner that the law in question was an *ex post facto* law, and therefore forbidden by section 16 of article 1 of the constitution. The definition of *ex post facto* laws, as settled by repeated decisions of the supreme court of the United States, is: "*Ex post facto* laws relate to penal and criminal proceedings which impose punishment or forfeiture, and not to civil proceedings, and are not applicable to civil laws, but to penal and criminal laws only, which affect private rights retrospectively." (*Watson v. Mercer,* 8 Pet. 88; *Calder v. Bull,* 3 Dall. 386; *Fletcher v. Peck,* 6 Cranch, 87; *Ogden v. Saunders,* 12 Wheat. 266; *Satterlee v. Matthewson,* 2 Pet. 380.) The argument of counsel for plaintiff is predicated largely upon the assumption that the exercise of the elective franchise is an absolute right, and that both the constitutional provision and the statute are in violation of this right. All the authorities are against this assumption. It is only necessary to cite a few leading ones. The right of suffrage is not a natural right, nor is it an unqualified personal right. It is right derived from constitutions and statutes. It is regulated by the states, and their power to fix the qualifications of voters is limited only by the provisions of the fifteenth amendment to the constitution. (*Huber v. Reiley,* 53 Pa. St. 115; *Ridley v. Sherbrook,* 3 Cold. 569; *Anderson v. Baker,* 23 Md. 531; Brightly's Elect. Cas. 27; McCrary on Elections, 2d ed., p. 45, sec. 3; Paine on Elections, sec. 2.) It is said by Judge Cooley (Cooley's Constitutional Limitations, 589): "Participation in the elective franchise is a privilege, rather than a right, and it is granted or denied upon grounds of general policy." Chief Justice Bowie, in *Anderson v. Baker,* 23 Md. 531, says: "The right of suffrage is the

creation of the organic law, and might be modified or with-drawn by the same authority which conferred it without be-ing considered as the infliction of any punishment upon those who are disqualified." In *Blair v. Ridgely*, 41 Mo. 63, 97 Am. Dec. 248, and note, the court says: "The right to vote or to ex-ercise the privilege of the elective franchise is neither a natural, absolute, nor vested right, of which a man cannot be deprived but by due process of law, but is purely a conventional right, and may be enlarged or restricted, granted or withheld, at pleas-ure, with or without fault; for outside of society, and discon-nected with government, no person either has or can exercise the elective franchise as a natural right, and he only receives it upon entering the social compact, subject to such qualifica-tions as the state may prescribe." So completely is the au-thority to prescribe the qualification of voters held to be with-in the power of the legislature by the supreme court of the United States that said court, in the case of *Murphy v. Ramsey*, 114 U. S. 43, 5 Sup. Ct. Rep. 747, uses the following language, to wit: "It would be quite competent for the sovereign power to declare that no one but a married person shall be entitled to vote." The right of suffrage is a political right, conferred by the constitution or the laws of the state, and has ever been regarded as exclusively under state control. It may be granted or withheld, or given subject to such restrictions as the majority of those in whom the sovereignty resides may deem most con-ducive to the public welfare.

It is contended by counsel for the plaintiff that the "test oath" in the law of February 25, 1891, is in the nature of a "bill of attainder," or of "pains and penalties." Section 23, article 5 of the state constitution provides that "no person shall be eligible to the office of district judge unless he shall be thirty years of age." Does that "attaint" or inflict "pains and penalties" upon all citizens of the state learned in the law, who have not reached that period of longevity? Under our constitution the right of suffrage is confined to males over the age of twenty-one years. Does that "attaint" or inflict "pains and penalties" upon all the women of the state who

have reached their majority? Bills of attainder are at present unknown to our law. Some bills of attainder were passed by the states during and shortly after the Revolution, following English precedents. "It is to English criminal law that we must look for a definition of this constitutional prohibition. 'Attainder' is described in English criminal law to be that extinction of civil rights and capacities which takes place whenever a person who has committed treason or felony receives sentence of death for his crime." (1 Burrill's Law Dictionary, 111; 1 Stephen's Commentaries, 408.) The person so sentenced is called "attaint" or "attainted." He is no longer of any credit or reputation. He cannot be a witness in any court. Neither is he capable of performing the functions of a man, for, by an anticipation of his punishment, he is already dead by law. (4 Blackstone's Commentaries, 380; 4 Stephen's Commentaries, 446; 1 Burrill's Law Dictionary, 111.) The consequences of attainder are forfeiture of estates and titles and corruption of blood. (4 Blackstone's Commentaries, 387; 3 Blackstone's Commentaries, 251; 1 Burrill's Law Dictionary, 111.) A bill of attainder is a bill brought into parliament for attainting persons condemned for high treason. (1 Tomlinson's Law Dictionary, 145.) Story says bills of attainder are such special acts of the legislature as inflict capital punishment upon persons supposed to be guilty of high offenses, such as treason and felony, without any conviction in the ordinary course of judicial proceedings. (3 Story on the Constitution, 209.) In *Green v. Shumway,* 39 N. Y. 419, cited by counsel, the law was decided to be unconstitutional, because the constitution of New York prescribed the qualifications of voters, and gave the legislature no power to prescribe other or different qualifications. In the opinion the court cited the cases of *Cummings v. State,* 4 Wall. 277, and *Ex parte Garland,* 4 Wall. 333. Neither of these cases are at all similar to the case at bar, nor to the case of *Green v. Shumway,* as in both the test oath absolutely prohibited the parties from following their chosen professions or avocations—the one the ministry, the other the law—lawful avocations, by which they gained a

livelihood. The right to pursue these avocations was a natural right attaching to every man, both in a state of nature and as a member of society, and as sacred and inviolable as the right to till the soil, and in no sense similar to the right of suffrage, which we have seen is a privilege conferred or withheld by the law-making power. *Davies v. McKeeby,* 5 Nev. 369, is similar to *Green v. Shumway* in this: That in Nevada the constitution prescribed the qualifications of voters, and no power was given to the legislature to change or add to these requisites. The law in question in that case did so, and was therefore held unconstitutional. We have seen that in this state the constitution (section 4, article 6) expressly authorized the legislature to prescribe other qualifications, limitations, etc. The above cases are therefore not in point. It is the opinion of the court, therefore, that the law attacked in this case is not an *ex post facto* law; that it is not in the nature of a bill of attainder; and that it is an enactment clearly within the constitutional power of the legislature. The necessity of the law, or the absence of such necessity, or its apparent hardship, cannot be permitted to affect the determination of the court. The peace of society and the welfare and happiness of the people demand that due respect shall be given by the court to the law-making power; and, when laws are clearly constitutional, application for change must be made to that branch of the government which alone can make and unmake the law. The writ must be denied, and it is so ordered.